08-5442-cv
Andrew Slayton v. American Express

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued: October 19, 2009                    Decided: May 18, 2010)

Docket No. 08-5442-cv

_____

ANDREW KEITH SLAYTON, on behalf of himself and all others similarly situated, GLICKENHAUS & COMPANY, ADAM CRAIG SLAYTON, on behalf of himself and all others similarly situated, ADAM CRAIG,

*Plaintiffs-Appellants,*

ATLAS EQUITIES, LORETTO ARZU, CHARLES HOVANESIAN, SAM WIETSXHNER, SHIRAZ SIDI, WILLIAM M. PALESE, SCOTT BARRENTINE, YVETTE YEIDMAN, MALKA RUBIN, JULIE DROSS, BROWN FAMILY TRUST,

*Consolidated-Plaintiffs,*

—v.—

AMERICAN EXPRESS COMPANY, KENNETH CHENAULT, HARVEY GOLUB, DAVID R. HUBERS, JAMES M. CRACCHIOLO,

*Defendants-Appellees.*[*]

_____

Before:

CALABRESI and KATZMANN, *Circuit Judges.*[**]

_____

[*] The Clerk of the Court is directed to amend the caption as set forth above.

[**] Judge Jon O. Newman, originally a member of the panel, recused himself from consideration of this matter after oral argument took place and did not participate in this decision. This appeal is being decided by the remaining members of the panel, who are in agreement. *See* 2d Cir. R. 0.14.

Appeal from a judgment of the United States District Court for the Southern District of New York (William H. Pauley, *Judge*) entered October 9, 2008, dismissing the plaintiffs' second amended complaint. In the second amended complaint, the plaintiffs alleged violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* On appeal, they limit their case to one allegedly misleading statement made in the defendants' May 15, 2001 quarterly report. We hold that the alleged misleading statement is a forward-looking statement that is protected by the safe harbor of the Private Securities Litigation Reform Act. We accordingly affirm the judgment of the district court.

―――――――――――

KENT A. BRONSON (Sanford P. Dumain, Arthur R. Miller, *of counsel*), Milberg LLP, New York, NY; Christopher Lovell and Imtiaz A. Siddiqui, Lovell Stewart Halebian LLP, New York, NY; Law Offices of Lawrence G. Soicher, New York, NY, *for Plaintiffs-Appellants*.

ROBERT E. ZIMET (Susan Saltzstein, Christopher P. Malloy, William F. Clarke, Jr., Irene M. Ten Cate, Daniel M. Gonen, *of counsel*), Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *for Defendants-Appellees.*

MICHAEL A. CONLEY, Deputy Solicitor (Mark D. Cahn, Deputy General Counsel, Jacob H. Stillman, Solicitor, Dominick V. Freda, Senior Counsel, *of counsel*), Securities and Exchange Commission, Washington, DC, *for amicus curiae Securities and Exchange Commission.*

―――――――――――

KATZMANN, *Circuit Judge*:

This case requires us to decide whether an allegedly misleading statement made in one of defendant American Express's regulatory disclosure documents is protected by the safe harbor provision of the Private Securities Litigation Reform Act ("PSLRA"). In the course of our

analysis, we interpret Congress's provision that a defendant shall not be liable for a forward-looking statement if it is "identified as a forward-looking statement, and . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or if "the plaintiff fails to prove that the forward-looking statement . . . was . . . made or approved by [an executive] officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c).

The plaintiffs appeal from the October 9, 2008 judgment of the United States District Court for the Southern District of New York (Pauley, *J.*) dismissing their Second Amended Complaint. We determine that the defendants are not entitled to safe harbor protection under the meaningful cautionary language prong of the safe harbor at this stage of the litigation because their cautionary language is vague. We conclude, however, that the defendants' allegedly misleading statement is protected by the actual knowledge prong of the safe harbor because the plaintiffs did not plead facts demonstrating that the statement was made "with actual knowledge . . . that the statement was false or misleading," *id*. Accordingly, we affirm the judgment of the district court.

# I

The plaintiffs are investors who purchased American Express stock between July 26, 1999 and July 17, 2001.[1] The defendants are American Express Company ("American Express"

---

[1] Because the plaintiffs have narrowed their claim on appeal, they state that if this case were remanded, they would seek a class period of May 15, 2001 through July 18, 2001.

or the "Company"); Harvey Golub, Chairman and CEO of American Express until late 2000; Kenneth Chenault, President, COO and successor to Golub as Chairman and CEO at the Company; David Hubers, President and Chief Executive of Company subsidiary American Express Financial Advisors ("AEFA"); and James M. Cracchiolo, Chairman and CEO of AEFA.

According to the plaintiffs' Second Amended Complaint ("SAC"), starting in the 1990s, American Express began an over-investment in high-yield debt securities. These investments included junk bonds and collateralized debt obligations ("CDOs"). While peer companies limited high-yield debt investments to seven percent of their portfolios, ten to twelve percent of AEFA's portfolio was made up of these investments. Ultimately, this overinvestment resulted in American Express losing hundreds of millions of dollars in 2000 and 2001.

This appeal regards a statement that American Express made in a quarterly report filed with the Securities and Exchange Commission ("SEC") in May 2001. In that filing, the Company stated, in essence, that while it had lost $182 million from its high-yield debt investments in the first quarter of 2001, it expected further losses from those investments to be substantially lower for the remainder of 2001. The plaintiffs allege that the defendants violated the Securities Exchange Act of 1934 when they made this statement because at the time they made it, the defendants knew it was misleading.

The source of the plaintiffs' allegations is a *Wall Street Journal Asia* article that the plaintiffs attached to their SAC, and the following account is taken from that article.[2] In early

---

[2] On a motion to dismiss, we may consider "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Comm'ns. Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

4

2001, after the Company reported losses of $123 million in 2000 from its high-yield debt investments, Chenault belatedly ordered a "very hard look" at the Company's high-yield debt portfolio. By late February 2001, defendant Chenault and Gary Crittenden, then American Express's CFO, received an e-mail from AEFA CFO Stuart Sedlacek that "set a huge alarm ringing" concerning the rapid deterioration of AEFA's high-yield debt portfolio. Joint Appendix ("J.A.") at 1671. On April 2, 2001, the Company announced an additional $182 million in first quarter 2001 high-yield write-downs. "The Company was quick to add, though, that the worst of the problem was behind it and that no further surprises were expected." *Id*. A press release stated that "[t]otal losses on these investments for the remainder of 2001 are expected to be substantially lower than in the first quarter." J.A. at 142-43.

According to the article, in early May 2001, Cracchiolo received a fax from Sedlacek "advising him that American Express was facing additional losses on its high-yield debt investments beyond those already booked." J.A. at 1671. Chenault was advised of the situation the next day, during a visit to AEFA's Minneapolis headquarters. There, he was told that the deterioration of the high-yield debt portfolio was so bad that "even the investment-grade CDOs held by American Express showed potential deterioration" because defaults on the underlying bonds had risen so sharply. *Id*. Chenault asked, "What are we talking about here?" *Id*. Cracchiolo replied, "We really don't know enough to even give you a range." *Id*. "Didn't we look at this in the first quarter?" Chenault queried, "What happened?" *Id*. Hoping to find an answer, American Express brought in Walter Berman, a former American Express treasurer who had rejoined the firm at the start of that year. "He and David Yowan, the Company's senior vice president of risk management in New York, began crunching numbers." *Id*.

5

In the meantime, on May 15, 2001, American Express filed its quarterly report (Form 10-Q) for the first quarter of 2001. In it, the Company reported the $182 million in first quarter losses from AEFA's high-yield debt portfolio. The Company explained, "[t]he high yield losses reflect the continued deterioration of the high-yield portfolio and losses associated with selling certain bonds." J.A. at 1616. Importantly, it added that "[t]otal losses on these investments for the remainder of 2001 are expected to be substantially lower than in the first quarter." *Id*. According to the SAC, American Express made this statement ("the May 15 statement") despite the fact that "Defendant[] Chenault . . . had been expressly informed in early May 2001 that the $182 million first quarter write-down did not reflect the true magnitude of the deterioration of AEFA's high-yield debt portfolio." J.A. at 224. The plaintiffs allege that the "[d]efendants were aware that they had no reasonable basis upon which to continue to make this representation." J.A. at 220.

The Form 10-Q also contained a caution. Several pages after the statement that losses for the remainder of 2001 were expected to be substantially lower, the Form 10-Q warned that it "contain[ed] forward-looking statements, which are subject to risks and uncertainties." It added that "[f]actors that could cause actual results to differ materially from these forward-looking statements include . . . potential deterioration in the high-yield sector, which could result in further losses in AEFA's investment portfolio." J.A. at 1624.

The *Wall Street Journal Asia* article reported that in early July 2001, Berman and Yowan completed their review of AEFA's high-yield debt portfolio. American Express had previously relied in large part "on the reports generated by outside CDO managers to evaluate the health and performance of the investment-grade [CDOs]," and it was not until Berman and Yowan's

6

review that "the company began to draw its own conclusions about all [of the] bonds that underpinned the securities." J.A. at 1671-72. When Chenault sat down in the conference room to hear the results, he had no idea what to expect and hoped that the situation would be manageable. He was "stunned" by Berman and Yowan's estimate of $400 million in losses, and "began firing questions at his team." J.A. at 1672. The $400 million figure resulted from the fact that "[i]nstead of adopting the optimistic view . . . that defaults already were peaking, the company decided to use the current default rate of 8% to 9%, and assumed it would stay constant for the next 18 months"—a very conservative assumption. J.A. at 1672.

On July 18, 2001, American Express issued a press release announcing that it would be taking an $826 million loss due to "additional write-downs in the high-yield debt portfolio at [AEFA] and losses associated with rebalancing the portfolio towards lower-risk securities." J.A. at 225. This amount included the $403 million loss related to the investment-grade CDOs reported by Berman and Yowan, as well as other losses from planned sales of high-yield bonds and lower-grade CDOs.

On July 17, 2002, the plaintiffs filed this action, bringing claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The defendants moved to dismiss the complaint. The district court granted the motion on March 31, 2004, holding that two of the plaintiffs' claims were time-barred and the remaining claims failed to state a claim upon which relief could be granted. *In re Am. Express Co. Secs. Litig.*, No. 02 Civ. 5533, 2004 WL 632750 (S.D.N.Y. 2004). We vacated the decision, holding that the claims were not time-barred, and remanded for further consideration by the district court, expressing no view on the merits of any of the claims. *See Slayton v. Am. Express Co.*, 460 F.3d 215, 230-31 (2d Cir. 2006).

7

On January 11, 2007, the plaintiffs filed the SAC, alleging, among other things, that when the defendants made the May 15 statement that losses for the remainder of 2001 were expected to be substantially lower, they knew that they had no reasonable basis upon which to make it. The defendants again moved to dismiss, and the district court granted the motion by memorandum and order dated September 26, 2008. *In re Am. Express Co. Secs. Litig.*, No. 02 Civ. 5533, 2008 WL 4501928 (S.D.N.Y. September 26, 2008). With regard to the May 15 statement at issue in this appeal, the district court found that:

> The information [Cracchiolo] and Chenault received in May 2001 could support an inference of scienter because it suggests that they had access to information indicating that the May 15, 2001 statement was no longer accurate. However, in light of the fact that Defendants immediately put together a team to analyze all of AEFA's High Yield Debt and then announced the results of the analysis in July 2001, the more compelling inference is that Defendants were not acting with an intent to deceive, but rather attempting to quantify the extent of the problem before disclosing it to the market.

*Id*. at \*8. The district court therefore held that the plaintiffs failed to state a claim with respect to the May 15 statement. The plaintiffs appeal only this part of the district court's decision—contending that the defendants' May 15 statement that "[t]otal losses on these investments for the remainder of 2001 are expected to be substantially lower than in the first quarter [of 2001]" violated the Securities Exchange Act.

## II

The plaintiffs bring their claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5 states that it "shall be

8

unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Under the law of this Circuit, to state a claim under Rule 10b-5, a plaintiff must allege that, in connection with the purchase or sale of securities, the defendant made material misstatements or omissions of material fact, with scienter, and that the plaintiff's reliance on the defendant's actions caused injury to the plaintiff. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). Section 20(a) of the Act establishes joint and several liability subject to a good faith exception for every person who, directly or indirectly, controls any person liable under any provision of the Act. 15 U.S.C. § 78t(a).

The Securities Exchange Act of 1934 was amended by the PSLRA in 1995. Pub. L. No. 104-67, 109 Stat. 737 (Dec. 22, 1995). The PSLRA established a statutory safe-harbor for forward-looking statements. With certain exceptions discussed further below, where a "private action . . . is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading," a defendant "shall not be liable with respect to any forward-looking statement . . . if and to the extent that—

> (A) the forward-looking statement is—
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement— . . .
> (ii) if made by a business entity; was—
> (I) made by or with the approval of an executive officer of that entity; and

9

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c). The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading. *See Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 371-72 (5th Cir. 2004).

## III

We review a district court's ruling on a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) *de novo*. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008). In considering a motion to dismiss a 10(b) action, we must accept all factual allegations in the complaint as true and must consider the complaint in its entirety. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by stating with particularity the circumstances constituting fraud. *See* 15 U.S.C. § 78u-4(b)(1); *see also ECA &Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under the PSLRA, where proof of scienter is a required element, as it is in the actual knowledge prong of the statutory safe harbor, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

10

Under this heightened pleading standard for scienter, a "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324. In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be "taken collectively." *Id.* at 323. The "strong inference" standard is met when the inference of fraud is at least as likely as any non-culpable explanations offered. *Id*. at 324.

The parties dispute whether the statutory safe harbor applies in this case. The defendants assert that they are entitled to safe harbor protection because the May 15 statement was a forward-looking statement that was accompanied by meaningful cautionary language and because the plaintiffs have not alleged facts supporting a strong inference that the defendants actually knew that the May 15 statement was misleading.[3] The plaintiffs respond that the May 15 statement is statutorily excluded from the safe harbor, and that even if it is not, the statutory safe harbor does not protect it. We first address whether the May 15 statement is statutorily excluded from the safe harbor, and after concluding that it is not, we turn to whether it is protected under either the meaningful cautionary language or the actual knowledge prong of the safe harbor.

As an initial matter, we conclude that the statement at issue in this case is a forward-looking statement as defined by the PSLRA. The PSLRA includes several definitions of a forward-looking statement, including "a statement containing a projection of . . . income

---

[3] The defendants do not assert that the May 15 statement is entitled to safe harbor protection because it is immaterial.

11

(including income loss), earnings (including earnings loss) per share, . . . or other financial items" and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management . . . ."  15 U.S.C. § 78u-5(i)(1)(A) & (C).  The defendants' statement, that "[t]otal losses on these investments for the remainder of 2001 are expected to be substantially lower than in the first quarter," in the Managers' Discussion and Analysis ("MD&A") portion of its Form 10-Q, fits comfortably within both of these definitions.

*A.*      *The May 15 Statement Was Not Included in a Financial Statement and Therefore Is Not Statutorily Excluded From the Safe Harbor.*

The parties first dispute whether the May 15 statement is excluded from the statutory safe harbor, which excludes forward-looking statements "included in a financial statement prepared in accordance with generally accepted accounting principles ["GAAP"]."  15 U.S.C. § 78u-5(b)(2)(A).  The statement at issue here was contained in American Express's May 15, 2001 Form 10-Q filed with the SEC.  The Form 10-Q contained several parts, including "Consolidated Statements of Income," "Consolidated Balance Sheets," "Consolidated Statements of Cash Flows," "Notes to Consolidated Financial Statements," and "Management's Discussion and Analysis of Financial Condition and Results of Operations ["MD&A"]."  J.A. at 1569-1607.  The statement was included in the MD&A part in a subsection titled "American Express Financial Advisors."  *Id.* at 1616.

We conclude that the May 15 statement, contained in the MD&A, was not included in a financial statement prepared in accordance with GAAP.  That Congress understood financial statements and MD&As to be distinct is apparent from the text of the PSLRA.  Congress explicitly included "a statement of future economic performance . . . contained in a discussion

12

and analysis of financial condition by the management" in its definition of a forward-looking statement, 15 U.S.C. § 78u-5(i)(1)(C), and then excluded "a forward-looking statement . . . that is . . . included in a financial statement prepared in accordance with [GAAP]." *Id*. § 78u-5(b)(2)(A). The plaintiffs assert that the exclusion logically highlights the reasonable expectation that representations made in SEC filings will be more closely scrutinized and more heavily relied upon by investors, and that it would be irrational to allow issuers to gain safe harbor protection merely by placing a statement in the MD&A portion of a filing. But the legislative history of this provision makes plain that a statement may receive safe harbor protection even where it is in an MD&A that is part of a required disclosure to the SEC. *See* H.R. Conf. Rep. 104-369, at 45-46 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730, 744-45 (hereinafter "Conference Report") (including in the definition of a forward-looking statement "certain statements made in SEC required disclosures, including management's discussion and analysis"). Moreover, drawing a distinction between the financial statement portion of the Form 10-Q and the MD&A section is not irrational, as the plaintiffs suggest. While the financial statement lays out the firm's income, balance sheets and cash flows, the purpose of the MD&A is to present the company's business "as seen through the eyes of those who manage [it]." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, 68 Fed. Reg. 75,056, 75,056 (Dec. 29, 2003).

Our conclusion finds support in the SEC's different treatment of financial statements and MD&A sections. SEC Regulation S-X sets forth "the form and content of and requirements for financial statements," 17 C.F.R. § 210.1-01, and requires interim financial statements in Form 10-Qs to include interim balance sheets, statements of income, and statements of cash flow, *see*

*id.* § 210.10-01.  SEC Regulation S-K sets forth "the requirements applicable to the content of

the *non-financial statement* portions" of certain filings, including MD&As.  *Id*. § 229.10

(emphasis added).  That regulation requires the MD&A section of a Form 10-Q to "[d]iscuss

registrant's financial condition, changes in financial condition and results of operations."  *Id*. §

229.303.  These regulations suggest that the SEC views the financial statement and the MD&A

as wholly different; there is no suggestion that the MD&A is viewed as a subset of a financial

statement.  This view also draws support from the Form 10-Q itself, which lists "Financial

Statements" and "Management's Discussion and Analysis of Financial Condition and Results

and Operations" as separate required items, *see* SEC Form 10-Q, *available at*

http://www.sec.gov/about/forms/form10-q.pdf, belying an assertion that the MD&A is "included

in [the] financial statement," and so excluded from the safe harbor, *see* 15 U.S.C. §

78u-5(b)(2)(A).[4]

Accordingly, we conclude that forward-looking statements contained in a separate

MD&A discussion in a Form 10-Q, such as the May 15 statement at issue here, are not excluded

from the statutory safe harbor under 15 U.S.C. § 78u-5(b)(2)(A).  We next turn to whether the

---

[4] Our conclusion is also in line with both the SEC's argument in its amicus curiae brief
in this case and its stated view that "[w]hile the statutory safe harbors by their terms do not apply
to forward-looking statements included in financial statements prepared in accordance with U.S.
GAAP, they do cover MD&A disclosures."  Disclosure in Management's Discussion and
Analysis About Off-Balance Sheet Arrangements and Aggregate Contractual Obligations, 68
Fed. Reg. 5,982, 5,993 n.146 (Feb. 5, 2003).  This statement was contained in the preamble to a
2003 rule promulgated in response to the Sarbanes-Oxley Act, which included an identical safe
harbor provision for the disclosure of forward-looking information required by that Act.  68 Fed.
Reg. at 5,992-93.  The defendants urge us to defer to the SEC's view pursuant to *Chevron
U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), as this view has been
articulated by the SEC in a formal release—the preamble to the 2003 rule.  However, we need
not determine whether the SEC's view should be granted *Chevron* deference, because we would
reach the same conclusion regardless of whether we afforded deference.

14

May 15 statement is protected under either the meaningful cautionary language prong or actual knowledge prong of the safe harbor.

**B.      *The May 15 Statement Was Not Accompanied by Meaningful Cautionary Language.***

Under the PSLRA, the defendants are not liable if the allegedly false or misleading statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . ." 15 U.S.C. § 78u-5(c)(1)(A)(i). The parties dispute both whether the May 15 statement was adequately identified as a forward-looking statement and whether it was accompanied by meaningful cautionary language.

The May 15 statement indicated that following AEFA's first quarter loss of $182 million, "[t]otal losses on [AEFA's high-yield] investments for the remainder of 2001 are expected to be substantially lower than in the first quarter." J.A. at 1616. Several pages later, the Form 10-Q warned that it "contain[ed] forward-looking statements, which are subject to risks and uncertainties." J.A. at 1624. The Company wrote, "[t]he words 'believe', 'expect', 'anticipate', 'optimistic', 'intend', 'aim', 'will', 'should' and similar expressions are intended to identify such forward-looking statements." *Id*. It added that "[f]actors that could cause actual results to differ materially from these forward-looking statements include . . . potential deterioration in the high-yield sector, which could result in further losses in AEFA's investment portfolio." *Id*.

The plaintiffs first contend that the defendants failed to adequately identify the May 15 statement as forward-looking. They argue that in order to be adequately identified as forward-looking, forward-looking statements must either be included in a discrete section clearly marked "Forward-Looking Statements" or specifically labeled as "forward-looking." The SEC

15

disagrees, asserting that the facts and circumstances of the language used in a particular report will determine whether a statement is adequately identified. It opines that "[t]he use of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement." The defendants join the SEC's argument on this point. We agree with the SEC.

Nothing in the statute indicates that to be adequately identified, a forward-looking statement must be contained in a separate section or specifically labeled, and we decline to write in such a requirement. We agree with the SEC that the facts and circumstances of the language used in a particular report will determine whether a statement is adequately identified as forward-looking. The May 15 statement is plainly forward-looking—it projects results in the future. It is also accompanied by a statement of the common-sense proposition that words such as "expect" identify forward-looking statements. *See Harris v. Ivax Corp.*, 182 F.3d 799, 804-806 (11th Cir. 1999) (holding that the statement "we expect reserves for returns and inventory writeoffs to be well above typical quarters," was a forward-looking statement protected by the cautionary language prong of the statutory safe harbor). Under these circumstances, we conclude that the May 15 statement was adequately "identified as a forward-looking statement." *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).

To be protected under the first prong of the safe harbor, however, a forward-looking statement must be both identified as such and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . ." *Id.* The SEC asserts that the May 15 statement

16

was not accompanied by meaningful cautionary language because the cautionary language itself was misleading in light of historical fact. By historical fact, the SEC means the facts that were established at the time the statement was made. Looking to the facts alleged by the plaintiffs, the SEC concludes that at the same time the defendants warned of *potential* deterioration in the high-yield sector, they knew of *actual* deterioration in that sector. The plaintiffs agree, and further point out that despite the additional knowledge gained by the defendants in early May 2001, the cautionary language contained in the May 15, 2001 Form 10-Q did not differ from the cautionary language the Company had used from at least January 2001 onwards.

The defendants respond that while they agree that misleading cautionary language is not meaningful, their cautionary language was not misleading. The defendants contend that the plaintiffs have not pleaded with the necessary particularity facts giving rise to a strong inference that they knew that the high-yield market would deteriorate further in the second quarter of 2001. Instead, pointing to the *Wall Street Journal Asia* article's statements that "more losses *could* still be lurking," and that the "investment grade CDOs . . . showed *potential* deterioration," the defendants contend that the plaintiffs have only shown that the defendants were aware of potential deterioration—the precise risk of which they cautioned.

We agree with the SEC and the parties that cautionary language that is misleading in light of historical fact cannot be meaningful,[5] but we do not think that proposition applies in this

---

[5] Such a proposition is supported by our case law. In applying the judicially-created bespeaks caution doctrine, on which the cautionary language prong of the PSLRA is based in part, *see* Conference Report at 43, 1995 U.S.C.C.A.N. at 742, we have held that cautionary language that is misleading in light of historical fact cannot be meaningful. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (holding that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired"). It is also supported by the Conference Committee's report. *See* Conference Report at 44, 1995

17

case.  As the defendants correctly assert, the facts alleged by the plaintiffs and supported by the *Wall Street Journal Asia* article do not demonstrate that the defendants misstated a historical fact—that the risk of which they warned, deterioration in the high-yield market that could cause further losses in AEFA's portfolio beyond those projected, had already transpired.  Instead they demonstrate that the defendants knew that AEFA's portfolio would very likely deteriorate due to rising defaults on the bonds underlying the investment-grade CDOs, a future projection that was not a historical fact.[6]

Instead, we think this case presents a different challenge.  What strikes us as the problem here is not that the defendants misstated a historical fact, but that they knew of the major and specific risk that rising defaults on the bonds underlying AEFA's investment-grade CDOs would cause deterioration in AEFA's portfolio at the time of the May 15 statement, and yet did not warn of it.  By directing us not to inquire into a defendants' state of mind, however, Congress may have foreclosed any inquiry into this problem.

The safe harbor protects forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A)(i).

U.S.C.C.A.N. at 743.

[6]  This case is quite different from the level of certainty that has been present in cases in which courts have concluded that a cautionary statement misstated historical fact.  *See Lormand*, 565 F.3d at 247 ("These warnings did not disclose that the defendants knew from past experience that the sub-prime subscriber programs and US Unwired's loss of control of customer care, billings and service posed an imminent threat of business and financial ruin and that some damage from these risks had already materialized."); *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) ("Bradbury's cautionary language only disclosed a *risk* that tenants *might* leave Forum Place—not his knowledge that PennDOT *actually planned* to do so in the near future.").

18

The question we face here is what Congress meant by "important." The statute itself does not define the term, and we find it ambiguous. Thus, while our analysis begins with the statutory text itself, where we find ambiguity we may delve into other sources, including the legislative history, to discern Congress's meaning. *SEC v. Dorozhko*, 574 F.3d 42, 46 (2d Cir. 2009). The conference report "is generally the most reliable evidence in legislative history of congressional intent because it represents the final statement of the terms agreed to by both houses." *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 147 (2d Cir. 2002).

The Conference Report accompanying the PSLRA explains that "[u]nder this first prong of the safe harbor, boilerplate warnings will not suffice . . . . The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business." Conference Report at 43, 1995 U.S.C.C.A.N. at 742. While the Conference Committee expected that "cautionary statements identify important factors that could cause results to differ materially," it did not expect them to identify all factors. *Id.* at 44, 1995 U.S.C.C.A.N. at 743. Importantly, the Conference Committee directed that "[t]he use of the words 'meaningful' and 'important factors' are [sic] intended to provide a standard for the types of cautionary statements upon which a court may, where appropriate, decide a motion to dismiss, without examining the state of mind of the defendant." *Id.* The Conference Committee explicitly advised that its requirement that the cautionary statement identify important facts is not intended to provide "an opportunity for plaintiff counsel to conduct discovery on what factors were known to the issuer" at the time the statement was made. *Id.* It stressed that "[c]ourts should not examine the state of mind of the person making the statement." *Id.*

19

We find Congress's directions difficult to apply in this case. On the one hand, the Conference Report makes quite plain that it does not want courts to inquire into a defendant's state of mind, i.e., a defendant's knowledge of the risks at the time he made the statements.[7] At the same time, however, the Conference Report requires cautionary statements to convey substantive information about factors that realistically could cause results to differ materially from projections. In order to assess whether an issuer has identified the factors that realistically could cause results to differ, we must have some reference by which to judge what the realistic factors were at the time the statement was made. We think that the most sensible reference is the major factors that the defendants faced at the time the statement was made. But this requires an inquiry into what the defendants knew because in order to determine what risks the defendants faced, we must ask of what risks were they aware.[8]

Congress may wish to give further direction on how to resolve this tension, and in

---

[7] The Eleventh and Sixth Circuits have held that courts may not inquire into a defendant's state of mind. *See Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010) ("So long as the language accompanying the projections is meaningfully cautionary, the law requires us to be unconcerned with the speaker's state of mind at the time he makes the projections."); *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 678 (6th Cir. 2003) ("No investigation of defendants' state of mind is required.").

[8] This view is supported by the Seventh Circuit's rule that in order to be protected by the cautionary language prong of the safe harbor, an issuer must have disclosed the "major risks [the issuer] objectively faced when it made its forecasts." *Asher v. Baxter International Inc.*, 377 F.3d 727, 734 (7th Cir. 2004). Such a rule is necessary, according to that court, because otherwise "any issuer could list its lines of business, say 'we could have problems in any of these,' and avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight." *Id.* at 733. And that is our fear here as well. Accepting the facts in the SAC as true, prior to making the May 15 statement, the defendants were presented with the major and specific risk that due to rising defaults in the underlying bonds, AEFA's own high-yield portfolio—including the investment-grade slices that, up to that point, American Express had assumed were solid—was very likely deteriorating, but they did not warn of it.

particular, the reference point by which we should judge whether an issuer has identified the factors that realistically could cause results to differ from projections. May an issuer be protected by the meaningful cautionary language prong of the safe harbor even where his cautionary statement omitted a major risk that he knew about at the time he made the statement? In this case, however, we need not decide that thorny issue because we conclude that at any rate the cautionary statement the defendants point to here was vague.

To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information. *See* Conference Report at 43, 1995 U.S.C.C.A.N. at 742. The Third Circuit has interpreted this direction to mean that:

> Cautionary language must be extensive and specific. A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.

*Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009) (quotation marks, citations, and alterations omitted). Similarly, the Fifth Circuit has held that "[t]he requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland Secs. Corp.*, 365 F.3d at 372; *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 246-47 (5th Cir. 2009) (concluding that cautionary language was not meaningful where the warning was "very vague and general" and did not "disclose the specific risks and their magnitude").

Here, all that the defendants point to in support of their argument that they are protected

21

by the cautionary meaningful language prong is the statement in the Form 10-Q that "potential deterioration in the high-yield sector . . . could result in further losses in AEFA's portfolio." *See* J.A. at 1624. The defendants argue that by including this language, they warned of the exact risk that caused their projection to miss the mark. But they did not. The defendants' caution, referencing the deterioration in the high-yield sector generally, is vague, and the pleaded facts do not support the defendants' assertion that this is the exact risk that materialized. Instead, the pleaded facts support a conclusion that the risk that materialized was that rising defaults on the bonds underlying AEFA's own investment-grade CDOs would cause deterioration in AEFA's portfolio. Moreover, even if we read the defendants' caution to warn of potential deterioration in AEFA's own portfolio, it verges on the mere boilerplate, essentially warning that "if our portfolio deteriorates, then there will be losses in our portfolio."

Our conclusion is bolstered by the fact that the defendants' cautionary language remained the same even while the problem changed. The same cautionary language that appeared in the May 15, 2001 Form 10-Q was included by the defendants in numerous reports as early as January 2001, and appeared both before and after the defendants reported the $182 million loss and received the early May 2001 communications. The consistency of the defendants' language over time despite the new information they received in early May 2001 belies any contention that the cautionary language was "tailored to the specific future projection," *Avaya, Inc.*, 564 F.3d at 256. *See Asher*, 377 F.3d at 734 ("Moreover, the cautionary language remained fixed even as the risks changed."); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 559 (6th Cir. 2001) (en banc) (noting that "as the Budget Act neared enactment and as the warning signs flared, Vencor's precautions grew more cursory and abstract" and that

22

"[s]ubstantially similar language" appeared in defendant's filings over the course of several years), *abrogated on other grounds by Tellabs, Inc.*, 551 U.S. 308.

Of course, the cautionary statement we focus on here was only one of many cautionary statements in the Form 10-Q. We recognize that the Conference Committee specifically stated that a defendant need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor, Conference Report at 44, 1995 U.S.C.C.A.N. at 743, and we do not hold to the contrary. The defendants, however, carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor, and they have not argued that the other factors they identified were important factors that could realistically cause results to differ materially. Absent such argument, we have no way of knowing if they were. Accordingly, we conclude that the defendants have failed to demonstrate that the May 15 statement is protected by the cautionary meaningful language prong of the statutory safe harbor.

**C.     *The Plaintiffs Have Not Shown that the May 15 Statement Was Made with Actual Knowledge that It Was Misleading.***

The safe harbor provision also requires dismissal if the plaintiffs do not "prove that the forward-looking statement . . . was . . . made or approved by [an executive officer] with *actual knowledge* by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B) (emphasis added). To do so, the plaintiffs must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc.*, 551 U.S. at 313 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)). Under this heightened pleading standard, a plaintiff must plead facts to support a *strong* inference of scienter, 15 U.S.C. § 78u-4(b)(2), that

23

is, the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314. Moreover, because the safe harbor specifies an "actual knowledge" standard for forward-looking statements, "the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Avaya, Inc.*, 564 F.3d at 274.

The Supreme Court has laid out a three-part prescription for carrying out this inquiry. First, as with any motion to dismiss, we must accept all factual allegations in the SAC as true. *Tellabs, Inc.*, 551 U.S. at 322. Second, we must consider the SAC, along with documents incorporated into the SAC, in their entirety. *Id.* "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-23. Third, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, [we] must take into account plausible opposing inferences." *Id*. at 323. This is because "[t]he strength of an inference cannot be decided in a vacuum[;]" it "is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id*. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324.

The SEC explains that the May 15 statement contained three implicit factual assertions—"(i) that the statement is genuinely believed; (ii) that there is a reasonable basis for that belief; and (iii) that the speaker is not aware of any undisclosed facts tending to seriously

24

undermine the accuracy of the statement." Brief for SEC as Amicus Curiae at 11. It asserts that "a forward looking statement is misleading if the speaker actually knows that one or more of these implicit factual representations is not true." *Id.* at 12; *see In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989). The parties agree with this statement of the standard.

Pointing to the Sedlacek fax warning of losses, the Minneapolis briefing, at which AEFA's CFO said he could not even give a range of potential losses, and the immediate formation of an investigative team to ascertain the extent of losses, the plaintiffs contend that the defendants had no reasonable basis upon which to issue the May 15 statement. The plaintiffs emphasize that while Cracchiolo told Chenault that "[w]e really don't even know enough to give you a range," the May 15 statement projected that very range—that future losses would be "substantially lower." The defendants disagree. They argue that the facts contained in the *Wall Street Journal Asia* article suggest that the defendants first learned that additional losses would likely be higher in July 2001, several weeks after the May 15 statement was made, when Chenault was "stunned" by Berman and Yowan's estimate. This new estimate was the result of conservative assumptions, and there is nothing in the SAC to indicate that these more conservative assumptions had been adopted prior to the May 15 statement, according to the defendants. Moreover, the defendants contend that American Express's history of disclosures about its high-yield portfolio, and commencement of an investigation and prompt disclosure of its findings must be counted against any inference of fraudulent intent. The defendants urge that the plaintiffs do not provide any reason why the defendants would knowingly make a false prediction, in deviation from their usual practice of prompt disclosure, even though the truth

25

would inevitably come to light within a few weeks.

The defendants have not contested that the plaintiffs adequately *specified* each statement alleged to have been misleading, *see* 15 U.S.C. § 78u-4(b)(1); *Tellabs, Inc.*, 551 U.S. at 321, and we conclude that they have been adequately specified. The question before us is whether the plaintiffs have stated with particularity facts giving rise to a strong inference that the defendants made the May 15 statement with actual knowledge that it was false or misleading. *See* 15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc.*, 551 U.S. at 321. In other words, we must determine whether a reasonable person would, based on the facts alleged in the SAC and contained in the *Wall Street Journal Asia* article upon which the SAC exclusively relies, deem an inference that the defendants (1) did not genuinely believe the May 15 statement, (2) actually knew that they had no reasonable basis for making the statement, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement, "cogent and at least as compelling as any opposing inference." *Tellabs, Inc.*, 551 U.S. at 323; *see Apple Computer Secs. Litig.*, 886 F.2d at 1113. While we find this question close, we conclude that a reasonable person would not.

Our analysis is case-specific. *See Avaya, Inc.*, 564 F.3d at 269. Our "job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically." *Tellabs, Inc.*, 551 U.S. at 326. We rest our conclusion "not on the presence or absence of certain types of allegations, but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya, Inc.*, 564 F.3d at 269. "Just as facts innocent in themselves may appear more suspicious in the company of other facts, so too can a fact that seems damning when presented alone sometimes be explained away by reference to other circumstances." *Id*. at 273 n.46.

26

We first consider the facts in the SAC that support an inference of scienter. *See S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 111 (2d Cir. 2009). As we have already explained, the facts support a conclusion that the defendants were presented with the highly likely risk that AEFA's high-yield portfolio would deteriorate due to rising defaults in the underlying debts in early May. The plaintiffs' facts also support an inference that the defendants did not know the extent of the likely deterioration. Specifically, at the early May meeting, after being told that even the investment-grade CDO's, which had been wrongly thought to be solid, showed potential for deterioration, defendant Chenault asked, "What are we talking about here?" Defendant Cracchiolo responded, "We really don't know enough to give you a range." Thereafter, the defendants brought in Berman and Yowan to find an answer to Chenault's question. These alleged facts support an inference that the defendants actually knew that they did not know the extent of the deterioration and therefore had no reasonable basis for predicting that very range by stating that "[t]otal losses on these investments for the remainder of 2001 are expected to be substantially lower than in the first quarter." The many warnings and "red flags," such as the "huge alarm ringing," J.A. at 1671, described in the *Wall Street Journal Asia* article further support this inference, *see Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 188 (4th Cir. 2009), which we find plausible.

We next consider "whether [the] inference of scienter is at least as compelling as any opposing inference of nonfraudulent . . . intent," *S. Cherry St.*, 573 F.3d at 111, bearing in mind that we cannot "scrutinize each allegation in isolation but [must] assess all the allegations holistically." *Tellabs, Inc.*, 551 U.S. at 326. The opposing nonfraudulent inference is that while the defendants knew that their high-yield portfolio was likely deteriorating, and that they did not

27

know the extent of the deterioration, they subjectively believed that the extent of the deterioration would lead to losses that would be substantially less than $182 million. The fact that Chenault was "stunned" by the $400 million figure in July supports such an inference. While the defendants' prediction that losses would be *substantially* lower does give us pause, nothing in the *Wall Street Journal Asia* article, on which the plaintiffs exclusively rely, directly supports the plaintiffs' contention that the defendants had reason to believe that the scope of the expected losses would be comparably large, i.e. that they had no basis to believe that the extent of the losses would be substantially lower than $182 million. Such "omissions and ambiguities count against inferring scienter." *Id*. That the losses eventually reported in July greatly exceeded $182 million likewise does not undermine the nonfraudulent inference because the plaintiffs may not plead fraud by hindsight. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d. Cir. 1994).[9]

Importantly, the plaintiffs have not alleged any theory as to why the defendants would knowingly mislead investors. The plaintiffs have not pleaded any facts supporting a motive to deceive. While "the absence of a motive allegation is not fatal," motive can be a relevant factor, and "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs, Inc.*, 551 U.S. at 325. "[T]he significance that can be ascribed to an allegation of motive, or lack

---

[9] We emphasize that under this prong of the statutory safe harbor, the plaintiffs must show more than recklessness—an objective inquiry—they must show actual subjective knowledge. Therefore, even if we were to conclude, based on the alleged facts, that the risk that losses would exceed $182 million was "so obvious that . . . defendant[s] must have been aware of it," *see Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977)), this would not avail the plaintiffs. *See Avaya, Inc.*, 564 F.3d at 274 ("In the case of the forward-looking statements, however, an inference of recklessness does not avail plaintiffs—that is, it must be placed on the nonculpable-explanation side of the balance when we weigh competing inferences.").

28

thereof, depends on the entirety of the complaint." *Id*.; *see Teamsters Local 445*, 531 F.3d at 197 (noting that because the plaintiffs "failed to allege that anyone at Dynex or Merit had a compelling motive to mislead investors . . . a number of competing inferences regarding scienter arise"). In evaluating scienter under a recklessness standard outside the context of the safe harbor, where the plaintiffs need only demonstrate that the defendants acted recklessly, we have stated that where the plaintiffs cannot make a motive showing, to raise a strong inference of scienter, their circumstantial evidence of fraud must be correspondingly greater. *ECA & Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 198-99. While here we do not apply the same test that we apply where the requisite scienter is recklessness, *see id*. at 198; *see generally Novak v. Kasaks*, 216 F.3d 300, 308-09 (2d Cir. 2000), we likewise conclude that where the plaintiffs do not allege facts supporting a motive, under our holistic review, their circumstantial evidence of actual knowledge must be correspondingly greater. Here, the plaintiffs circumstantial evidence of actual knowledge is not adequate.

Instead, when the facts contained in the Wall Street Journal Asia article are examined in their entirety, the circumstantial evidence supporting an inference of non-fraudulent intent is more compelling. *See Tellabs, Inc.*, 552 U.S. at 326. Rather than suggesting an intent to deceive investors, the facts contained in that article exhibit the defendants engaging in a good-faith process to inform themselves and the public of the risks. According to the article, following a disclosure that American Express lost $182 million in its high-yield debt investments in the first quarter, and after learning that there was potential deterioration in even the investment-grade CDOs, Chenault asked Berman and Yowan to crunch the numbers using a conservative set of assumptions. Working with in-house analysts, American Express was able to draw its own

conclusions about the bonds underlying their securities instead of relying on reports generated by outside CDO managers as they had previously. Shortly after Berman and Yowan reported the results, American Express formally announced an $826 million write-down.

These facts do not support an inference that American Express was trying to hide anything from its investors. Rather, they suggest that American Express had disclosed its losses in 2000 and in the first quarter of 2001, and that it was endeavoring in good faith to ascertain and disclose future losses. *See BearingPoint, Inc.*, 576 F.3d at 187 ("Later disclosures that timely raised questions about the reliability of financial information . . . lend weight to an inference that contemporaneous financial statements were made in good faith."); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 66 (1st Cir. 2008) (concluding that the plaintiffs' inference of scienter was not as strong as the nonfraudulent inference because the defendants' statements "candidly laid out the sorry financial history of the college"). Ordering an investigation as soon as they learned that the investment-grade CDOs might be deteriorating, and directing Berman and Yowan to use conservative assumptions, was "a prudent course of action that weakens rather than strengthens an inference of scienter." *Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 763 (8th Cir. 2009); *see Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.").

Moreover, the losses reported in July were the product of using different assumptions, representing the first time American Express drew its own conclusions rather than relying on reports generated by outside CDO managers, and also of the Company's subsequent business

30

decision to reduce the level of its high-yield portfolio. These new assumptions and decisions undermine any inference that the defendants suspected the magnitude of losses reported in July when they made the May 15 statement. *See Advest, Inc.*, 512 F.3d at 66 (concluding that fact that the "defendants may have been operating under a different set of assumptions" supported an inference that they did not set a target that they knew they could not achieve).

While we find the inference of fraudulent intent plausible, and consider this to be a close case, when we examine the record as a whole, we conclude that the inference of fraudulent intent is not "at least as compelling as any opposing inference one could draw from the facts alleged." *See Tellabs, Inc.*, 551 U.S. at 324. Accordingly, the May 15 statement is protected under the statutory safe harbor and the district court correctly dismissed the plaintiffs' claim under section 10(b) of the Securities Exchange Act of 1934.

Because "[i]n order to establish a prima facie case of liability under § 20(a), a plaintiff must show . . . a primary violation by a controlled person," *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998), the district court also correctly dismissed the plaintiffs' claim under section 20(a) of the Securities Exchange Act of 1934.

**IV**

For the foregoing reasons, we **AFFIRM** the district court's judgment.