VICTOR MARRERO, United States District Judge
Lead Plaintiff Afshin Galestan ("Galestan" or "Plaintiff") brings this putative securities class action, on behalf of himself and all other persons similarly situated, against defendants OneMain Holdings, Inc. ("OneMain" or the "Company"), OneMain's President and Chief Executive Officer Jay N. Levine ("Levine"), and OneMain's Chief Financial Officer Scott T. Parker ("Parker," and together with Levine, the "Individual Defendants") (collectively, "Defendants"). Plaintiff alleges that Defendants made materially false and misleading statements in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") ("Section 10(b)") and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5"). Plaintiff also alleges that the Individual Defendants violated Section 20(a) of the Exchange Act ("Section 20(a)"). (See"Amended Complaint," Dkt. No. 20.)
By letter dated August 23, 2017, Defendants notified Plaintiff of their intent to seek permission to file a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b) (6) (" Rule 12(b) (6)"). Defendants argue that Plaintiff's Amended Complaint is deficient because the allegations are conclusory and the challenged statements are not actionable. (See"August 23 Letter" or "Def. Motion to Dismiss," Dkt. No. 24.) By letter dated September 18, 2017, Plaintiff responded to the August 23 Letter, arguing that the Amended Complaint adequately alleges violations of Section 10(b), Section 20(a), and Rule 10b-5. (See"September 18 Letter" or "Pl. Opp'n," Dkt. No. 25.) By letter dated September 29, 2017, Defendants replied to the September 18 Letter, arguing in further support of a motion to dismiss. (See"September 29 Letter" or "Def. Reply," Dkt. No. 26.)
The Court now construes Defendants' August 28 Letter as a motion to dismiss. For the reasons set forth below, Defendants'
*287 motion to dismiss the Amended Complaint is DENIED.
I. BACKGROUND [1]
A. FACTUAL BACKGROUND
Plaintiff is an investor who purchased OneMain common stock during the proposed Class Period, February 25, 2016 through November 7, 2016 (the "Class Period"). The OneMain business involves originating and servicing personal loans at OneMain branches across the country. OneMain is the entity that resulted from the acquisition of OneMain Financial Holdings, LLC ("OneMain Financial") by Springleaf Holdings, Inc. ("Springleaf") in November 2015 (the "Acquisition"). OneMain Financial and Springleaf had different business models: OneMain Financial, the larger of the two companies, focused on unsecured loans (i.e., loans not backed by collateral) while Springleaf focused on secured loans (i.e., loans backed by collateral). The companies also differed in how they reviewed loan applicants: OneMain Financial used a computerized underwriting platform called Symphony to evaluate whether to advance loans to borrowers, whereas Springleaf used an underwriting platform called Class that required Springleaf underwriters to perform additional review before approving loans.
Following the Acquisition, OneMain sought to integrate the OneMain Financial branches into the new, combined Company by implementing a number of integration initiatives. For example, OneMain required loans provided by OneMain Financial branches to be secured by collateral, preferably automobiles. OneMain also changed the underwriting process at OneMain Financial branches by requiring an additional layer of review and, by September 2016, switching the branches off the Symphony platform and onto the Class platform. Plaintiff alleges that these integration initiatives were "wreaking havoc" on OneMain's operations and financial performance. (Amended Complaint ¶ 3.)
Plaintiff's allegations relate to three issues. First, Plaintiff alleges that integration efforts at OneMain Financial branches caused productivity to decline because (i) the Company made the underwriting process more complicated; (ii) the Company shifted the branches' focus toward secured loans; and (iii) the Company fired longtime OneMain Financial employees and management. Second, Plaintiff alleges that integration efforts caused delinquency rates to increase at OneMain Financial branches because the Company removed certain tools that these branches used to combat delinquencies. Third, Plaintiff alleges that the productivity and delinquency issues were exacerbated by the switch from the Symphony to the Class underwriting platform because the Company failed to provide adequate resources and training.
1. Accounts of Former Employees
In support of his allegations, Plaintiff provides the accounts of eleven unnamed former employees ("FEs") who were employed -- before and during the Class Period -- by OneMain Financial and, following the Acquisition, OneMain. The FEs held positions at OneMain Financial and OneMain that provided them with access to meetings, phone calls, and emails, as well as opportunities to observe the activities of the companies. Based on the FEs' information, Plaintiff alleges that Defendants knew about the difficulties related to the *288 integration efforts, but failed to disclose them. The Court summarizes a selection of the FEs' accounts below.
FE1 was a Branch Account Executive II at a OneMain Financial, and, following the Acquisition, OneMain, branch. FE1 claimed that the switch from the Symphony to Class platform "bottlenecked everything." (Id. ¶ 76.)
FE2 was a Branch Manager at a OneMain Financial, and, following the Acquisition, OneMain, branch. FE2 attended a manager's kick-off meeting in or around January 2016. Levine and Parker were present at the meeting, during which they "specifically addressed that productivity at the branches was bad and was something that needed to be corrected." (Id. ¶ 78.) FE2 recounted how the change in focus from unsecured to secured lending negatively impacted productivity at OneMain Financial branches. FE2 also described reports generated on the Symphony platform that showed productivity and delinquency rates for each branch. During the Class Period, FE2 was offered, and received, cash bonuses to address increased delinquencies at FE2's branch.
FE3 was a Branch Manager for OneMain Financial and, following the Acquisition, OneMain. FE3 corroborated FE1's claim that the switch from the Symphony to Class platform negatively impacted productivity. FE3 also described how everyone at the Company had access to the branch reports generated on the Symphony platform, which showed decreased productivity and increased delinquency rates at OneMain Financial branches.
FE4 was a Branch Manager for OneMain Financial and, following the Acquisition, OneMain. According to FE4, in November 2016, OneMain reintroduced certain tools that had previously been banned. FE4 understood this change in policy to have resulted from shareholders' response to the Company's delinquency rates.
FE5 was an Area Director for OneMain Financial and, following the Acquisition, OneMain, who supervised approximately sixty-two branches. According to FE5, Defendants either observed or recklessly disregarded increased delinquencies because a business metric -- the 60 days past due at six months on book metric -- would have shown an increase in delinquency rates as early as March 2016 or by June 2016 at the latest.
FE6 was a OneMain Financial, and, following the Acquisition, OneMain, District Manager who supervised six or seven branches. After the Acquisition, FE6 participated on three conference calls, which took place approximately every two to three months. Levine also participated on these calls, during which he acknowledged the decrease in productivity and increase in delinquencies at OneMain Financial branches.
FE7 was a OneMain Financial, and, following the Acquisition, OneMain, Senior Vice President until October 2016. FE7 stated that the Individual Defendants received or had access to reports detailing productivity issues at OneMain Financial branches. According to FE7, one such report, which was generated through the Symphony platform at the end of every month, showed decreases in productivity at OneMain Financial branches. FE7 emailed the reports to senior executives at the Company, including OneMain Executive Vice President Mary McDowell, OneMain Financial Chief Operating Officer John Schachtel ("Schachtel"), who reported directly to Levine, and OneMain Vice President of Operations George Roach ("Roach"), who reported directly to Bradford D. Borchers ("Borchers"), who in turn reported directly to Levine. On a monthly basis, FE7 also emailed an Excel report to senior executives and area managers -- a *289 report that "would have gone to any executive in charge of the [ ] OneMain [Financial] branches." (Amended Complaint ¶ 84.) The Excel reports that FE7 circulated similarly showed decreases in productivity and increases in delinquencies at OneMain Financial branches.
FE8 was a OneMain Financial, and, following the Acquisition, OneMain, District Manager who supervised seven or eight branches. FE8 attended a meeting in May 2016 during which Schachtel and Borchers acknowledged the district managers' concerns about increased delinquency rates and the Company's ban on certain tools used to combat delinquencies. Additionally, FE8 attended a meeting in the early fall of 2016 during which Borchers again indicated that he understood that increased delinquencies were a challenge at OneMain Financial branches.
FE9 was a former employee of OneMain Financial and, following the Acquisition, OneMain. FE9 served as Vice President of Internal Communications and Strategic Initiatives for OneMain Financial prior to the Acquisition. FE9 recounted that "the negative impact that integration efforts were having on branch productivity was a known concern throughout the Company." (Id. ¶ 89.)
FE10 was a former employee of OneMain Financial and, following the Acquisition, OneMain, who served as a Project Manager for the Training Department. According to FE10, Company management constantly tracked financial performance through the Symphony platform.
FE11 was an Audit and Compliance Senior Analyst at OneMain Financial and, following the Acquisition, OneMain. FE11 recounted how the differences between the Class and Symphony platforms made the transition from one platform to the other difficult.
Viewed together, the FEs' accounts describe how Defendants not only received reports detailing productivity and delinquency issues at OneMain Financial branches, but also how they regularly had access to such reports. Multiple FEs recounted that the Symphony platform included a feature showing productivity and delinquency metrics for each branch and reports detailing real-time productivity assessments for the branches. In addition, the Symphony platform ranked all branches based on productivity. According to FE3, all OneMain employees, including the Individual Defendants, had access to these reports.
Furthermore, the FEs provide information relating to the Individual Defendants' knowledge of productivity and delinquency issues at OneMain Financial branches. For example, FE2 stated that delinquency problems were discussed at the manager's kick-off meeting in or around January 2016, a meeting that Levine and Parker attended. Similarly, FE6 recounted that Levine acknowledged the increase in delinquencies during the conference calls on which FE6 participated following the Acquisition.
Plaintiff alleges that other factors further demonstrate Defendants' knowledge, or reckless disregard, of integration-related problems. For example, FE2 was offered, and received, a cash bonus of approximately $800 to address delinquency rates at FE2's branch.[2] Similarly, by April *290 2016, OneMain introduced new incentives to combat delinquencies. OneMain also reintroduced certain tools that OneMain Financial branches used to combat delinquencies. Finally, FE5 stated their belief that the increased rate of delinquencies "would have been spotted as early as March 2016 and definitely by June 2016" based on the 60 days past due at six months on book metric. (Id. ¶ 126.)
2. Defendants' Allegedly False or Misleading Statements
Plaintiff alleges that, after the Acquisition, Defendants made positive statements about the integration of OneMain Financial and Springleaf, as well as the Company's operations and financial performance. Plaintiff contends that these statements were materially false or misleading because the integration efforts were, in fact, "wreaking havoc" on the Company. (Amended Complaint ¶ 3.) Specifically, Plaintiff alleges that, during the Class Period, Defendants made materially false and misleading statements concerning (i) the post-Acquisition integration efforts at OneMain Financial branches; (ii) the achievability of the Company's 2016 and 2017 earnings guidance; and (iii) uncertainties and material risks associated with OneMain that were known to Defendants at the time the statements were made. The Court summarizes a selection of the allegedly false or misleading statements below.
i. February 25, 2016 Conference Call
During a conference call held on February 25, 2016, Levine stated that "[t]he popularity of our auto refinance program fits perfectly with the [OneMain Financial] customer base." (Id. ¶ 139.) During the same conference call, Parker stated that "[t]he introduction of direct auto and increasing originations of hard secured loans have been very successful strategies for Springleaf, and we're very confident that they'll be equally effective as [sic] OneMain, with the anticipated outcome of driving lower losses." (Id. ¶ 140.) Plaintiff alleges that these statements were materially false and misleading because the Individual Defendants knew or recklessly disregarded the fact that productivity at OneMain Financial branches was negatively impacted by the change in focus from unsecured to secured lending.
In connection with the February 25, 2016 conference call, OneMain provided a PowerPoint presentation that included the Company's financial earnings guidance for fiscal years ("FY") 2016 and 2017 (the "Guidance"). The presentation showed projected earnings per share ("EPS") of $4.50-$5.00 for FY 2016, and projected EPS of $6.20-$6.70 for FY 2017. Regarding the 2016 and 2017 Guidance, Parker stated the following:
As we begin to realize the benefit from growth, credit performance and operating expense synergies, we are projecting a core EPS in 2016 in the range of $4.50 to $5.00.... With the 2016 EPS amount anticipated to grow to the range of $6.20 to $6.70 per share in 2017.
(Id. ¶ 143.) Plaintiff alleges that these statements were materially false and misleading because Defendants misrepresented or failed to disclose that integration activities caused productivity to decline, delinquencies to increase, and growth to slow at OneMain Financial branches.
ii. Risk Factor Disclosures in the February 29, 2016 and April 7, 2016 SEC Filings
On February 29, 2016, OneMain filed its annual Form 10-K for FY 2015, which the Individual Defendants signed. Plaintiff alleges that the Form 10-K misled investors *291 because it stated that the risks involved with integration activities were merely speculative. Specifically, the Form 10-K stated the following:
It is possible that the integration process could take longer than anticipated and could result in the loss of valuable employees, additional and unforeseen expenses, the disruption of our ongoing business, processes and systems, or inconsistencies in standards, controls, procedures, practices, policies and compensation arrangements, any of which could adversely affect our ability to achieve the anticipated benefits of the OneMain Acquisition.
(Id. ¶ 145.) On April 7, 2016, in connection with a senior notes offering, OneMain filed with the SEC a Form 424B5, which included a prospectus supplement incorporating by reference the risk factors listed in the Form 10-K for FY 2015, including the above-quoted statement.
Plaintiff alleges that these statements misled investors by suggesting that the risks involved with integration activities were merely speculative. Specifically, Plaintiff alleges that these statements were misleading because the risk -- i.e., that integration activities could disrupt OneMain's financial performance -- had already materialized. According to Plaintiff, at the time of these filings, the integration-related changes at OneMain Financial branches had already produced negative financial results, which made the risk not merely a possibility, as the Company's statements represented, but a reality.
iii. May 4, 2016 Conference Call
During a conference call on May 4, 2016, Parker discussed the introduction of secured loans at OneMain Financial branches:
From the time we first announced the acquisition last March, we have talked about the great opportunity we have to ramp up originations at OneMain, including secured lending. We're really pleased with the responses to the new offerings from the OneMain [Financial] branch team members, who appreciate being able to offer customers choices and options that were not previously available.
(Id. ¶ 149.) As with the prior statements, Plaintiff alleges that this statement was misleading because Defendants misrepresented or failed to disclose the fact, of which they then had knowledge, that integration activities had already caused productivity to decline, delinquencies to increase, and growth to slow at OneMain Financial branches. Plaintiff also alleges that Parker misrepresented or failed to disclose that employees at OneMain Financial branches were not responding positively to the new loan offerings. Plaintiff contends that, in reality, those employees were negatively impacted by the Acquisition because they were required to learn Springleaf's underwriting process; they were required to sell secured loans when their customers preferred unsecured loans; and the integration efforts diverted management and employee attention and resources.
In connection with the May 4, 2016 conference call, OneMain provided a PowerPoint presentation that showed projected earnings of $4.20-$4.70 per share for FY 2016, and projected earnings of $5.60-$6.10 per share for FY 2017. Regarding the 2016 and 2017 Guidance, Parker stated the following:
I would like to review our core EPS guidance for 2016 and 2017 and illustrate the positive operating leverage in our model. First, for 2016, we are maintaining our prior guidance, but adjusting it by $0.30 to reflect the sale of SpringCastle and the impact on earnings for the last three quarters of the year, *292 which bring us to a range of $4.20 to $4.70 per share.
For 2017, we're following the same approach, with about half the change in the guidance coming from the SpringCastle impact and half due to the higher expected funding cost, as I just explained. This brings us to a range of $5.60 to $6.10 for 2017.
(Id. ¶ 152.) Plaintiff alleges that Defendants' statements on the conference call and in the PowerPoint presentation misled investors and analysts by implying that integration efforts were positively affecting OneMain's operations and financial performance when in reality they were not. In support of this argument, Plaintiff provides excerpts from contemporaneous analyst reports to demonstrate how analysts interpreted or understood these statements. (See id. ¶¶ 154-55.)
iv. Risk Factor Disclosure in the May 6, 2016 SEC Filing
On May 6, 2016, OneMain filed a Form 10-Q for the first fiscal quarter of FY 2016 ("1Q16"), which was signed by the Individual Defendants. The Form 10-Q provided no update to OneMain's risk factors as they were listed in the Company's Form 10-K for FY 2015. The Form 10-Q reflected that "there have been no material changes to our risk factors previously disclosed[.]" (Id. ¶ 156.) Plaintiff alleges that this statement was materially false for the same reasons that the February and April SEC filings were false. (See discussion supra Part I.A.2.ii.) Plaintiff also alleges that OneMain continued to mislead investors and analysts about how the integration efforts were impacting the Company's financial performance. For example, Plaintiff cites to a June 29, 2016 report by an analyst at Northland Capital Markets. The analyst noted that the "[i]ntegration progress sounds like it is on track with a lot of heavy lifting being done on the underwriting system and marketing system" and "Springleaf's auto program has been very effective since beginning its rollout in December of 2015 and become fully rolled out to all legacy OneMain branches by end of April 2016." (Id. ¶ 159.) According to Plaintiff's theory, the analyst's statements were made in reliance on, or influenced by, Defendants' misrepresentations.[3]
v. August 4, 2016 Press Release
In an August 4, 2016 press release, OneMain announced its financial results for the second fiscal quarter of 2016 ("2Q16"). The press release quoted Levine:
I want to say that the second-quarter was a very good quarter for us with consumer insurance EPS of $0.96 versus $0.36 in last year's quarter, with solid performance on credit, growth, operating expenses, funding, and importantly, integration. We feel very good about our business, our operating model, and our competitive position.
(Id. ¶ 160.) Plaintiff also alleges that Levine made a number of false or misleading statements regarding the effects of the Company's integration efforts during an August 4, 2016 conference call. For example, Levine said the following: "[t]he integration of Springleaf and OneMain remains on track"; "we have made meaningful progress on implementing the technology integration required of the two networks"; "[t]he timing of our integration activities is meeting all of our expectations, and in some cases, even ahead of plan"; and "[w]e remain comfortable *293 with our previously stated EPS guidance for 2017 of $5.60 to $6.10 per share, with an average receivables of $16 billion." (Id. ¶¶ 161, 167.)
Plaintiff alleges that these statements were materially false and misleading because Defendants misrepresented or failed to disclose that Defendants did not provide adequate resources for training related to integration; that the training programs that were provided at OneMain Financial branches were of limited utility; and that confusion surrounding the transition from the Symphony to Class platforms led to increased delinquencies at OneMain Financial branches.
On the August 4, 2016 conference call, Levine also discussed the introduction of secured lending at OneMain Financial branches. Specifically, he stated:
We introduced direct auto lending to the former OneMain branches in December of last year and shortly after closing and by the end of April of this year we were originating direct auto loans in all 1,800 of our branches. Our early success with the rollout contributed to a meaningful improvement in origination growth at the former OneMain branches ... and we see this initiative adding over $1 billion of new originations over the next 12 months.
(Id. ¶ 163.) Levine also stated that he wanted "to discuss the significant progress [OneMain has] made on a couple of integration initiatives." (Id. ¶ 164.)
Plaintiff alleges that these statements were materially false and misleading because Defendants misrepresented or failed to disclose that the focus on secured lending negatively impacted productivity at OneMain Financial branches. This was due to the fact that OneMain Financial customers preferred unsecured loans and did not have the collateral necessary for obtaining secured loans. Furthermore, according to Plaintiff, these statements misrepresented or failed to disclose that the focus on secured lending hindered -- instead of facilitated -- growth, which meant that these initiatives did not -- and would not -- contribute to increased originations at OneMain Financial branches. Finally, Plaintiff alleges that Levine failed to disclose that the focus on secured lending negatively impacted productivity such that it was not reasonably likely that the Company would achieve its 2016 and 2017 Guidance.
vi. Risk Factor Disclosure in the August 5, 2016 SEC Filing
On August 5, 2016, OneMain filed a Form 10-Q for the second fiscal quarter of FY 2016, which was signed by the Individual Defendants. The Form 10-Q provided no update to the Company's risk factors as listed in the Company's Form 10-Q for 1Q16: the Company's Form 10-Q for 2Q16 stated that "[t]here have been no other material changes to the risk factors included in Part I - Item 1A of our 2015 Annual Report on Form 10-K." (Id. ¶ 169.) Plaintiff alleges that this statement was materially false for the same reasons that the February and April SEC filings were false. (See discussion supra Part I.A.2.ii.)
3. The November 7, 2016 Conference Call and Its Aftermath
During a conference call on November 7, 2016, Defendants disclosed the effects of the integration process, including decreased productivity and increased delinquencies. As a result of these issues, Defendants revealed that the Company could not achieve the 2016 and 2017 Guidance. Defendants therefore reduced the Company's earnings per share guidance for FY 2016 from a range of $4.20-$4.70 to a range of $3.60-$3.70, and the guidance for FY 2017 from a range of $5.60-$6.10 to a range of $3.75-$4.00.
On November 8, 2016, OneMain filed a Form 10-Q for the third fiscal quarter of 2016 ("3Q16"), which included new information *294 and risk disclosures regarding the Company's integration efforts. Specifically, the Form 10-Q noted that "[t]he OneMain Acquisition may not achieve its intended results, and we may be unable to successfully integrate our and OneMain's operations." (Amended Complaint ¶ 198.) The Form 10-Q also acknowledged the following:
Given the substantial integration-related systems conversion activity and branch consolidation that we have planned through the first half of 2017, we may experience a heightened level of delinquency, net charge-offs and increases in the provision for receivables losses for the balance of 2016 and 2017.
(Id. ) At the JPMorgan Fintech & Specialty Finance Conference on November 30, 2016, Defendants made additional admissions regarding the negative effects of the integration process.
B. PROCEDURAL BACKGROUND
Following the November 2016 revelations regarding the effects of OneMain's integration efforts, Plaintiff filed the complaint in this putative class action on February 10, 2017. (See Dkt. No. 1.) After the appointment of counsel and lead plaintiff (see Dkt. No. 12), Plaintiff filed the Amended Complaint on June 13, 2017 (see Dkt. No. 20).
Consistent with the Court's Individual Practices, Defendants notified Plaintiff of perceived deficiencies in the Amended Complaint by letter dated August 23, 2017. (See August 23 Letter.) Defendants expressed their intent to move to dismiss the Amended Complaint upon receiving the Court's assessment of the correspondence. (See id. at 1.) In support of their contemplated motion to dismiss, Defendants make a number of arguments. First, Defendants argue that Plaintiff fails to plead (let alone with specificity) any facts regarding "the timing, magnitude, or scope of the supposed 'negative impact' from integration" activities prior to November 2016, thus rendering Plaintiff's allegations conclusory and subject to dismissal. (Id. at 1-2.) Defendants also put forth what they describe as a "far more compelling" inference: "Defendants were optimistic about the Acquisition's prospects and cautioned investors about its potential risks," but "when intensive integration activities in 3Q16 caused a temporary slowdown in growth greater than expected, Defendants promptly [ ] disclosed" the problem. (Id. at 1.) Second, Defendants argue that the challenged statements are insufficient to state a claim because (1) the statements are inactionable puffery and/or not demonstrably false; (2) Plaintiff failed to allege that the Individual Defendants acted with the required scienter; and/or (3) the statements are protected by the Private Securities Litigation Reform Act of 1995 ("PSLRA") safe harbor provision for forward-looking statements. (See id. at 2-3.) Third, Defendants argue that any claims based on third-party analyst reports must fail because Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011), precludes liability for such statements. (See id. at 3.)
Plaintiff responded to Defendants' letter on September 18, 2017, arguing that the Complaint adequately alleges violations of Section 10(b), Rule 10b-5, and Section 20(a). (See September 17 Letter.) Plaintiff contends that the Amended Complaint alleges facts sufficient to support a strong inference of scienter because the Amended Complaint pleads specific facts provided by FEs who worked at all levels of the Company. (See id. at 1-2.) Plaintiff also contests Defendants' characterization of the allegations in the Amended Complaint as conclusory, arguing that Defendants misconstrue Plaintiff's claims: "Plaintiff does not allege the misstatement of any historical financial metric requiring quantification, but rather the failure to disclose known, material, integration-related *295 problems ... existing from the beginning of the Class Period." (Id. at 2.) Finally, Plaintiff argues that the challenged statements are neither inactionable puffery nor protected by the PSLRA safe harbor provision. Specifically, Plaintiff argues that the challenged statements do not constitute puffery because they are concrete statements that omitted information about known material problems. Furthermore, Plaintiff argues that the challenged statements are not protected by the safe harbor provision because they constitute statements of present fact that were not accompanied by adequate cautionary language. (See id. at 3.) Alternatively, Plaintiff argues that the cautionary language is itself misleading, and therefore cannot insulate the challenged statements because it warned of a risk that Defendants characterized as "possible," though they knew it already existed. (See id. ) Finally, Plaintiff argues that Defendants' Janus argument is inapposite because the Amended Complaint describes analyst reports merely to demonstrate that Defendants' statements misled the market, not as an independent basis for liability. (See id. at 3 n.9.)
By letter dated September 29, 2017, Defendants replied to Plaintiff and requested a conference to discuss their anticipated motion to dismiss. (See September 29 Letter at 1.) In reply, Defendants largely reiterate their arguments from the August 23 Letter, contending that Plaintiff failed to identify any specific facts, as opposed to conclusory assertions, in support of their allegations. (See id. at 2-3.)
II. LEGAL STANDARDS
A. RULE 12(B)(6) MOTION TO DISMISS
Defendants request leave to file a motion to dismiss the Amended Complaint. (See Def. Motion to Dismiss; Def. Reply.) Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b) (6).
"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. See id. However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 127 S.Ct. 1955. The task of a court is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig., 383 F.Supp.2d 566, 573-74 (S.D.N.Y. 2005) (internal quotation marks omitted), aff'd sub nom. Tenney v. Credit Suisse First Boston Corp., Inc., No. 05-Civ-3430, 2006 WL 1423785 (2d Cir. May 19, 2006) ; accord In re MF Global Holdings Ltd. Sec. Litig., 982 F.Supp.2d 277, 302 (S.D.N.Y. 2013).
The requirement that a court accept the factual allegations in the complaint as true does not extend to legal conclusions. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. In adjudicating a Rule 12(b)(6) motion, a court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice *296 may be taken." Leonard F. v. Israel Disc. Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). However, plaintiffs claiming fraud -- including securities fraud concerning material misstatements and omissions -- must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) (" Rule 9(b)") by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).
The PSLRA, discussed in greater detail infra Part II.B, also imposes heightened pleading standards for plaintiffs alleging securities fraud. When a plaintiff alleges that defendants made misleading statements or omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b) (1). To adequately plead scienter, "the complaint shall ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). When reviewing a motion to dismiss a securities fraud complaint, a court shall dismiss the complaint if these two requirements are not met.
B. THE EXCHANGE ACT
To state a claim for misrepresentation or omission under Section 10(b) and Rule 10b-5, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007) ; see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). Certain elements of these claims are further defined by the PSLRA's amendments to the Exchange Act.
Separately, "Section 20 (a) of the Exchange Act imposes derivative liability on parties controlling persons who commit Exchange Act violations." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 238 n.6 (2d Cir. 2016) (internal quotation marks omitted). "To establish a prima facie case" for Section 20(a) liability, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 108.
1. Misstatements or Omissions of Material Fact
The PSLRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b) ; see also Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004) ("To meet the pleading standard of Rule 9(b), this Court has repeatedly required, among other things, that the pleading explain why the statements were fraudulent." (internal quotation marks omitted) ). A "pure omission" is actionable "only when the [defendant] is subject to a duty to disclose the omitted facts." In re Vivendi, 838 F.3d at 239. Although "Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a 'duty to be both accurate and complete.' "
*297 Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co., 753 F.Supp.2d 166, 180 (S.D.N.Y. 2010) (quoting Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002) ).
2. Scienter
Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (internal quotation marks omitted). To allege scienter, a plaintiff must "state with particularity [the] facts giving rise to a strong inference that the defendant acted with the required state of mind." Rombach, 355 F.3d at 176. A plaintiff can fulfill this requirement by "(1) alleg[ing] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) alleg[ing] facts to show that defendants had both motive and opportunity to commit fraud." Id. (internal citations and quotation marks omitted). Ultimately, "a complaint will survive [a motion to dismiss] ... only if ... the inference of scienter [is] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010) (internal quotation marks omitted). When assessing whether a strong inference exists, "the allegations are not to be reviewed independently or in isolation, but the facts alleged must be 'taken collectively.' " Id. (quoting Tellabs, 551 U.S. at 324, 127 S.Ct. 2499 ).
3. PSLRA Safe Harbor
The PSLRA contains a safe harbor provision that applies to forward-looking statements, including "statement[s] containing a projection of ... income (including income loss), earnings (including earnings loss) per share, ... or other financial items," as well as "statement[s] of future economic performance, including any such statement[s] contained in a discussion and analysis of financial condition by the management[.]" Slayton, 604 F.3d at 766-67 (internal quotation marks omitted). Under the PSLRA, a person "shall not be liable with respect to any forward-looking statement," 15 U.S.C. § 77z-2 (c), but only to the extent that they can show that: (1) the statements were accompanied by meaningful cautionary language; (2) the statements were immaterial; or (3) the plaintiff failed to prove the statements were made with actual knowledge that they were false or misleading. See Slayton, 604 F.3d at 766.
When evaluating the adequacy of cautionary language, a court must "identify the allegedly undisclosed risk and then read the allegedly fraudulent materials -- including the cautionary language -- to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." In re Focus Media Holding Ltd. Litig., 701 F.Supp.2d 534, 540 (S.D.N.Y. 2010) (internal quotation marks omitted); see also Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 359 (2d Cir. 2002) ("[T]he key question a district court must decide when determining whether to grant a motion to dismiss a securities fraud complaint is whether plaintiffs have overcome the existence of such [cautionary] language. Plaintiffs may do this by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss."). However, "cautionary language that is misleading in light of historical fact cannot be meaningful." Slayton, 604 F.3d at 770.
4. Inactionable Statements
Certain types of statements, including puffery and opinion statements, are not actionable because they are not misleading. "Puffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would *298 not rely on it, thereby rendering it immaterial as a matter of law." In re General Elec. Co. Sec. Litig., 857 F.Supp.2d 367, 384 (S.D.N.Y. 2012) ; see also In re Vivendi, 838 F.3d at 245 ("Puffery encompasses statements [that] are too general to cause a reasonable investor to rely upon them, and thus cannot have misled a reasonable investor." (internal citations and quotation marks omitted) ). This rule permits companies "to operate with a hopeful outlook," because corporate officers "are not required to take a gloomy, fearful or defeatist view of the future." Rombach, 355 F.3d at 174 (internal quotation marks omitted). But statements are not puffery when they constitute "misrepresentations of existing facts" that were made even though the speaker "knew that the contrary was true." Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000) (rejecting a puffery argument where "the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"); see also In re Bank of Am. Corp. Sec., Derivative & ERISA Litig., 757 F.Supp.2d 260, 310 (S.D.N.Y. 2010) ("[T]here is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in 'misrepresentations of existing facts.' " (quoting Novak, 216 F.3d at 315 ) ).
When the alleged misstatements or omissions are related to statements of opinions, a plaintiff must also show that (1) "the speaker did not hold the belief [they] professed," (2) "the supporting fact[s] [they] supplied were untrue," or (3) "the speaker omit [ted] information ... [that] makes the statement misleading to a reasonable investor." Tongue v. Sanofi, 816 F.3d 199, 209-10 (2d Cir. 2016) (citing Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, --- U.S. ----, 135 S.Ct. 1318, 1332, 1327, 191 L.Ed.2d 253 (2015) ).
III. DISCUSSION
A. WHETHER THE ALLEGATIONS ARE CONCLUSORY
Defendants primarily argue that the Amended Complaint should be dismissed because Plaintiff's allegations are conclusory assertions that the integration process negatively impacted productivity and delinquency rates at OneMain Financial branches. According to Defendants, Plaintiff fails to plead specific facts describing the timing, magnitude, and scope of the negative impact. (See Def. Motion to Dismiss at 1-2.) The Court disagrees. Plaintiff alleges facts sufficient to illustrate the existence of a negative impact stemming from the integration activities. As the court held in City of Roseville Employees' Retirement System v. EnergySolutions, Inc., 814 F.Supp.2d 395 (S.D.N.Y. 2011), at the motion to dismiss stage, "the plaintiffs may not [need] to allege precise dollar values and dates, [but] they [are] required to plead something more than a broad statement that was consistent with the Company's actual disclosures." Id. at 414. Here, Plaintiff alleges specific facts regarding the effects of integration efforts such as changes to the underwriting platform, a shift in focus from unsecured to secured lending, lack of (or inadequate) training, and changes to the tools available at OneMain Financial branches -- all of which Defendants allegedly knew, and failed to disclose, had caused productivity to decrease, delinquencies to increase, and growth to slow.
Plaintiff alleges these facts with more specificity than the plaintiffs in the cases to which Defendants cite in support of their argument. In one such case, the court held that the statements by confidential informants alleging that sales of color cosmetics were " 'struggling,' 'underperform[ing],' 'forecasted to be down,' and 'smaller than expected' due to a 'significant *299 increase' in competitor products" were conclusory and insufficient to support the assertion that defendants omitted a material fact from their registration statement. In re Coty Inc. Sec. Litig., No. 14-Civ-919, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016). Similarly, the court in Bettis v. Aixtron determined that the information provided by confidential witnesses, who alleged that defendant mismanaged operational processes, "in no way contradict[ed] or undermine[ed] [the company's] statement to investors[.]" No. 16-Civ-00025, 2016 WL 7468194, at *9-10 (S.D.N.Y. Dec. 20, 2016). Here, by contrast, Plaintiff identifies specific metrics and reports on the Symphony platform that allegedly measured productivity and delinquency rates. These include, for example, the 60 days past due at six months on book metric described by FE5 and the Symphony platform real-time reports on branch productivity described by FE4. (See, e.g., Amended Complaint ¶ 85, 126.) The Court therefore finds that the Amended Complaint is not conclusory because Plaintiff pleads facts with sufficient particularity.
Defendants also cite Ford v. Voxx Int'l Corp., No. 14-Civ-4183, 2016 WL 3982466 (E.D.N.Y. July 22, 2016). The Voxx Court discussed two cases in which the allegations of confidential witnesses were deemed insufficient due to a lack of quantification. See id. at *5. However, these cases are distinguishable from the present action because the allegations in both cases related to overstatement or overvaluation -- namely, situations in which quantification is necessary to illustrate the alleged fraud. For example, in City of Roseville, the confidential witness alleged that the value of a trust fund had declined by May 2008, but the witness did not specify the period over which the value declined or the amount of the decline. See 814 F.Supp.2d at 414. Such details were essential to illustrate plaintiff's claim that the value of the trust fund was overstated. See id. In the present case, however, Plaintiff does not allege that Defendants understated the magnitude of the negative impact. Instead, Plaintiff alleges that Defendants failed to disclose the existence, of which Defendants had knowledge, of the negative impact following the Acquisition. As Plaintiff notes in opposition to Defendant's motion to dismiss, Plaintiff "does not allege the misstatement of any historical financial metric requiring quantification, but rather the failure to disclose known, material, integration-related problems ... existing from the beginning of the Class Period." (Pl. Opp'n at 2.)
Defendants, citing Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc., 531 F.3d 190 (2d Cir. 2008), further argue that the FEs' references to internal Company reports are insufficient. (See Def. Motion to Dismiss at 2.) However, Teamsters is distinguishable from the present case. The plaintiff in Teamsters pointed to "collection data" that reflected a high percentage of certain loans and related default delinquencies, which the court deemed insufficient. 531 F.3d at 196. The court found that plaintiff's "broad reference to raw data lack[ed] even an allegation that these data had been collected into reports that demonstrated that loan origination practices were undermining the collateral's performance." Id. In the present case, by contrast, the FEs do not merely reference raw data; they identify metrics and reports generated on the Symphony platform, as well as reports that were regularly distributed by email to the Company's management. These metrics and reports allegedly showed the negative effects of integration activities, including decreased productivity and increased delinquencies at OneMain Financial branches. (See, e.g., Amended Complaint ¶¶ 80-88, 116-20.) The Court is therefore persuaded that the Amended Complaint does not lack sufficient quantification.
*300 Based on the foregoing, the Court finds that Plaintiff's allegations are stated with sufficient particularity to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.
B. SCIENTER
The PSLRA requires a plaintiff to state with particularity the facts giving rise to a strong inference that the defendant acted with scienter, i.e., the required state of mind. See 15 U.S.C. § 78u-4(b)(2) ; Rombach, 355 F.3d at 176. A plaintiff can satisfy this requirement by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. Here, Defendants correctly note that Plaintiff does not allege scienter based on motive and opportunity. (See Def. Motion to Dismiss at 1.) However, the Court is persuaded that the Amended Complaint contains allegations sufficient to constitute strong circumstantial evidence of conscious misbehavior or recklessness.
Circumstantial evidence of recklessness exists if the factual allegations demonstrate that a defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotation marks omitted). Here, Plaintiff does not allege that Defendants personally benefitted from the purported fraud, nor does Plaintiff allege that Defendants engaged in deliberately illegal acts. The Court therefore addresses only on the third and fourth prongs.
With respect to the third prong, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Teamsters Local 445, 531 F.3d at 196 (quoting Novak, 216 F.3d at 309 ); see also In re Wachovia Equity Sec. Litig., 753 F.Supp.2d 326, 351 (S.D.N.Y. 2011). To support such allegations, a plaintiff may rely on information gathered from confidential witnesses as long as the witnesses "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak, 216 F.3d at 314.
The Court is not persuaded by Defendants' argument that the FEs' allegations fail to provide particularized facts giving rise to a strong inference that Defendants recklessly disregarded specific information contradicting their public statements. (See Def. Motion to Dismiss at 3.) Defendants claim that the FEs cannot speak to the Individual Defendants' knowledge because only two of the FEs claim to have had contact with Levine or Parker, and none of the FEs claim that Levine or Parker reviewed any of the reports or data. (See id. ) But assuming -- as the Court must when evaluating a motion to dismiss -- that the facts in the Amended Complaint are true, the Court finds that Plaintiff has alleged particularized facts giving rise to a strong inference of recklessness. The accounts of the FEs establish that the Individual Defendants participated in numerous meetings and conference calls during which the negative effects of integration-related activities were discussed. (See, e.g., Amended Complaint ¶¶ 78-79.) Similarly, the FEs identified specific reports that were circulated during the Class Period. (See, e.g., id. ¶¶ 80-84.) For example, FE7, a former *301 Senior Vice President, described a monthly email that included an Excel report detailing decreases in productivity. According to FE7, this report "would have gone to any executive in charge of the Legacy OneMain branches," which presumably would have included the Individual Defendants. (Id. ¶ 84.) The FEs also described various Symphony platform reports to which Defendants had access during the Class Period. These reports allegedly detailed the negative effects of the Company's integration efforts. (See, e.g., id. ¶¶ 85-88.) Given these allegations, the Court is persuaded that the Amended Complaint includes sufficient facts showing that the Individual Defendants either had knowledge of information -- or had access to information that they should have monitored -- contradicting their public statements. Accordingly, Plaintiff has properly pleaded scienter.
Moreover, the cases to which Defendants cite in support of their scienter argument are distinguishable from the present action. The complaint in In re Wachovia lacked allegations that any confidential witnesses met the defendants; it made general allegations without reference to a specific time period; and it did not identify which reports revealed contrary information or what information those reports contained. See 753 F.Supp.2d at 351-52. Similarly, in Campo v. Sears Holdings Corp., the confidential witnesses testified that they had no knowledge or reason to believe that defendants reviewed or had access to the relevant reports. See 371 Fed. App'x 212, 217 (2d Cir. 2010). But in the present case, the FEs identified which reports were circulated during the Class Period; they stated that these reports reached senior executives; they described the Symphony platform reports to which Defendants had access during the Class Period; and they described the Individual Defendants' attendance at meetings and on conference calls during which integration-related issues were discussed. (See, e.g., Amended Complaint ¶¶ 78-90, 111-27.)
The Court finds, instead, that the allegations in this case are similar to those in Cornwell v. Credit Suisse Grp., 689 F.Supp.2d 629 (S.D.N.Y. 2010). In Cornwell, this Court found that a complaint sufficiently alleged scienter by stating that "executives reviewed specific reports that should have alerted them to the problems they later allegedly misrepresented." Id. at 637-38. The complaint in Cornwell also alleged the existence of "widespread knowledge at [the company] of the company's problems." Id. The Court reaches the same conclusion here. Plaintiff has demonstrated scienter by alleging that the Individual Defendants and their direct reports received and had access to Symphony platform and Excel reports detailing integration-related issues during the Class Period. Additionally, the Complaint includes information from FEs "from several geographic areas" and who "span different levels of the Company hierarchy," thus providing "[c]orroboration from multiple sources" to support an inference of scienter. Freudenberg v. E*Trade Fin. Corp., 712 F.Supp.2d 171, 197 (S.D.N.Y. 2010) (quoting In re Countrywide Fin. Corp. Derivative Litig., 554 F.Supp.2d 1044, 1058-59 (C.D. Cal. 2008) ). The Court considers these facts to be sufficiently particularized to give rise to a strong inference that Defendants recklessly disregarded specific information, of which they had knowledge, contradicting their public statements.
In a second line of argument, Defendants contend that the FEs' allegations do not speak to the Individual Defendants' knowledge because the FEs' "nebulous snippets" do not tie the productivity and delinquency issues to the Company's integration efforts. (See Def. Motion to Dismiss at 3.) This argument ignores that the FEs' accounts provide support for the connection between productivity and delinquency *302 issues, on the one hand, and integration efforts, on the other. According to FE2, for example, the introduction of the Springleaf auto loan product at OneMain Financial branches led to a decline in productivity because it was difficult for OneMain Financial customers to satisfy the additional underwriting requirements for those loans. (See Amended Complaint ¶ 95.) As another example, multiple FEs recounted how the new underwriting process at OneMain Financial branches -- which was a part of the integration effort -- led to a decline in productivity and an increase in delinquency rates. (See, e.g., id. ¶¶ 73-76, 122-24.) In light of this information, Defendants' argument that the FEs' accounts do not tie productivity and delinquency issues to integration efforts emphasizes form over substance. Defendants are essentially asking the Court to ignore the reasonable inference that -- given the timing of the productivity and delinquency issues after the Acquisition -- Defendants' discussions of productivity and delinquency issues were related to the integration efforts.
In a third line of argument, Defendants argue that Plaintiff fails to quantify the scope, magnitude, or duration of the integration problems. (See Def. Motion to Dismiss at 3.) At this early stage of litigation, and even with the heightened pleading standards of Rule 9(b) and the PSLRA, the Court "[does] not require the pleading of detailed evidentiary matter[s] in securities litigation." New Orleans Emps. Ret. Sys. v. Celestica, Inc., 455 Fed. App'x 10, 15 (2d Cir. 2011) (quoting In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001) ). Here, Plaintiff provides the accounts of multiple FEs who identified meetings and conference calls during which the Individual Defendants discussed integration-related issues, as well as specific internal reports that measured productivity and delinquency rates. Accepting these allegations as true and considering them collectively, the inference that the Individual Defendants had knowledge about the Company's integration-related issues during the Class Period is at least as compelling as the opposing inference that Defendants offer in their letter (i.e., Defendants were optimistic about the Acquisition's prospects when they made the alleged misstatements). (See Def. Motion to Dismiss at 1.) In passing upon a motion to dismiss, the Court must draw reasonable inferences and resolve any doubts in favor of Plaintiff. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).
Viewed together, the Court therefore finds that the Amended Complaint provides enough detail to sufficiently allege scienter.[4]
C. WHETHER THE CHALLENGED STATEMENTS ARE INACTIONABLE
1. Puffery
Defendants argue that the challenged statements are inactionable because *303 they constitute puffery. But Defendants fail to offer persuasive guidance for this argument. Defendants cite Fadia v. FireEye, Inc., No. 14-Civ-05204, 2016 WL 6679806 (N.D. Cal. Nov. 14, 2016), to show that "statements such as a combination of two companies is a 'natural extension ... of a partnership,' 'product synergies are strong,' and companies enjoy 'synergy potential' have been found to be examples of corporate optimism." Id. at *7 (quoting Grossman v. Novell, Inc., 120 F.3d 1112, 1121-22 (10th Cir. 1997) ). Here, instead of making barebones references to corporate synergies, the Individual Defendants made specific references to the "popularity of [their] auto refinance program" and "early success with the rollout." (Amended Complaint ¶¶ 139, 163.) These statements are "not so general that a reasonable investor could not have relied upon them in evaluating whether to purchase" OneMain stock. In re Vivendi, 838 F.3d at 245 (upholding a jury's conclusion that the statement "[t]he results produced by [the company] in the second quarter are well ahead of market consensus" was actionable and not puffery). Indeed, Defendants offered more than "rosy predictions" because they stated that integration was going smoothly and they made positive statements about the new loan offerings at OneMain Financial branches -- all while being aware of material productivity and delinquency concerns relating to the new loans that contradicted their public representations. See Novak, 216 F.3d at 315 (holding that defendants offered more than just rosy predictions when they "stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"). The Court therefore finds that the challenged statements do not constitute mere puffery.
2. Opinion Statements
Defendants argue that many of the challenged statements are opinions, specifically citing to statements such as "the combined companies fit perfectly together" and Defendants were "very confident" about the Company's financial prospects. (See Def. Reply at 5.) The Court is not persuaded by this argument. Viewing the Complaint in its entirety, accepting the factual statements as true, and drawing all reasonable inferences in Plaintiff's favor, the Court finds that the challenged statements are actionable because Plaintiff has, at the very least, shown that Defendants "omit[ted] information ... [that] [made] the statement misleading to a reasonable investor." Sanofi, 816 F.3d at 210. For example, Plaintiff alleges that Parker's statements on the May 4, 2016 conference call regarding the introduction of secured lending at OneMain Financial branches were misleading because the statements omitted information regarding decreased productivity and increased delinquencies resulting from the introduction of new loan products at OneMain Financial branches. In support of this allegation, Plaintiff cites to a June 29, 2016 report by a Northland Capital Markets analyst, who reported that the "auto [loan] program has been very effective since beginning its rollout in December of 2015." (Amended Complaint ¶ 159.) Pursuant to Plaintiff's theory, the analyst's report reflected the state of market knowledge, which relied on Defendants' public statements.[5] Accordingly, the Court is persuaded that the Amended Complaint sufficiently alleges omissions that would make the challenged statements misleading to a reasonable investor.
*304 3. PSLRA Safe Harbor Provision
Finally, Defendants allege that the Individual Defendants' statements are protected by the PSLRA safe harbor provision for forward-looking statements. (See Def. Motion to Dismiss at 3.) As Plaintiff correctly points out, many of the Individual Defendants' statements are not protected by the safe harbor provision because they were statements of present fact. For example, on the August 4, 2016 conference call, Levine stated: "We remain comfortable with our previously stated EPS guidance for 2017 of $5.60 to $6.10 per share, with an average receivables of $16 billion." (Amended Complaint ¶ 167.)
For other statements, Defendants have arguably provided some cautionary language in their Form 10-K for FY 2015, which stated:
It is possible that the integration process could take longer than anticipated and could result in the loss of valuable employees, additional and unforeseen expenses, the disruption of our ongoing business, processes and systems, or inconsistencies in standards, controls, procedures, practices, policies and compensation arrangements, any of which could adversely affect our ability to achieve the anticipated benefits of the OneMain Acquisition.
(Id. ¶ 145.) However, this boilerplate language likely does not rise to the level of "meaningful" cautionary language. Even so, courts in the Second Circuit have consistently held that "the PSLRA safe harbor [provision] ... [does not] protect [ ] material omissions." See, e.g., Wilson v. LSB Indus., Inc., No. 15-Civ-7614, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017). Here, Plaintiff alleges that Defendants failed to disclose problems and uncertainties, of which they had knowledge, that related to the integration of OneMain Financial branches into the combined Company and that, if disclosed, would have influenced the decisions of reasonable investors as to the purchase or sale of the Company's securities. Since these allegations relate to omissions of material information, the PSLRA safe harbor provision cannot insulate the challenged statements.
At this early stage of the proceedings, the Court therefore finds the PSLRA's safe harbor provision to be inapplicable.
IV. ORDER
For the reasons discussed above, it is hereby
ORDERED that the motion so deemed by the Court as filed by defendants OneMain Holdings, Inc., Jay N. Levine, and Scott T. Parker (collectively, "Defendants") to dismiss (Dkt. Nos. 24, 26) the Amended Complaint of Plaintiff Afshin Galestan (Dkt. No. 20) is DENIED .
It is further ORDERED that Defendants are directed to answer the Amended Complaint within twenty-one days from the entry of this Order.
SO ORDERED.

Except as otherwise noted, the factual background below derives from the Amended Complaint and the facts pleaded therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. See infra Section II.A. Except where specifically quoted, no further citation will be made to the Amended Complaint.

Plaintiff alleges that FE2 was offered the cash bonus "to get delinquencies in line at FE2's branch" or "to get FE2's branch to hit a certain percentage of delinquencies for a given month." (Amended Complaint § 121.) The Court notes that this language is vague because it does not specify whether FE2 was offered the bonus only for lowering the delinquency rate at FE2's branch. Viewing the Amended Complaint in its entirety -- including its allegation regarding the timing of the cash bonus after the Acquisition -- the Court draws the reasonable inference that OneMain provided the cash bonus to incentivize OneMain Financial branches to lower (as opposed to increase or maintain) their delinquency rates.

As with the discussion supra note 2, the Amended Complaint is ambiguous on this point. However, given the timing of the analyst report, which was released approximately a month and a half after the May 2016 conference call and SEC filing, as well as the text of the report (i.e., "sounds like"), the Court draws the reasonable inference that the analyst report was, at least, influenced by OneMain's public representations.

The Court notes that Plaintiff also advances the "core operations" theory as an alternative ground for pleading scienter. (See Pl. Opp'n at 2 n.3.) Pursuant to this doctrine, if "a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 875 F.Supp.2d 359, 371 (S.D.N.Y. 2012). Defendants correctly point out that it is unclear whether the core operations theory independently suffices to demonstrate scienter. (See Def. Reply at 4.) But given the Court's discussion above, Plaintiff has adequately alleged scienter without relying on the core operations theory.

In making this finding, and for the same reasons discussed supra note 3, the Court draws the reasonable inference that the analyst report was, at least, influenced by the Company's public representations.